## Osborne v. Helton.

Oct. 14, 1941.

Cleon K. Calvert and W. L. Hammond for appellant.

Golden & Lay, Walter B. Smith, Patterson & Wilson and James W. Smith for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

In this contest of the nomination of James S. Helton by his opponent, Pearl Osborne, as Republican candidate for sheriff of Bell County, the trial court struck out evidence that certain persons had bought votes for Helton and candidates for other offices because there was nothing tending to show that it was with his knowledge or authority. The ruling was proper. We therefore confine our consideration to two other charges argued·by appellant.

George Crockett, an old colored man, testified that early in the morning of election day a perfect stranger, a white man, came to where he was living in "a great big fine looking car" and asked him if he wanted "to treat out of a jar of liquor for Mr. Helton." Crockett accepted the invitation and was taken to Helton's home in Pineville. Outside of his garage he got a half-gallon jar of moonshine whisky, which he took home. He drank some of it and gave some to his wife and her sister. Every time he gave his wife a drink he told her "You-all drink this in remembrance of Mr. Helton."

Charlie Hemphill, another negro, related that a day or two before the election he and "Uncle" Dave Cornett followed the crowd to somebody's house and got a jar of moonshine. Charlie didn't know whether the place was in Pineville or not, or whether he got the liquor from a man or woman, for, said he: "If I go anywhere to get liquor I don't like to know the name of the people or who it is." He knew "no more than a rabbit" where Mr. Helton lived. One of the appellant's lawyers, apparently taken by surprise, testified that fifteen minutes before Hemphill had told him that it was at Helton's home that he got the liquor. Dave Cornett testified that Lee Brown slipped $2 in his pocket without his asking for anything, and that he had several drams on election day; but Dave was not asked about his visit with Charlie Hemphill to Helton's residence where Charlie said liquor was freely disbursed in quart jars.

The defendant testified unequivocally that there was no liquor in his house or on his premises. His garage is under his residence. It is quite a public place. When Helton left home early in the morning of election day he locked his garage, for it had things in it which might have been stolen. George Crockett was impeached by ten witnesses testifying that his general reputation for morality was bad. Seven of them stated that his reputation for truth and veracity was bad. On the other side several witnesses were presented who testified that his general reputation was good.

Ruth Miller testified that in the afternoon of election day Helton came to the Four Mile voting place and around the left-hand corner of the school building where the election was held, gave her $3 to vote for him. She did so across the table. The transaction, according to the witness, was seen by Mrs. Lawson, John Cross, Mrs. Black, Mrs. Hibbard, and Mrs. Lockhart. Three of these witnesses were called by the contestant to show that Helton was at the polls about ten minutes and had gone inside the building; but none of them was asked if he had talked with Ruth Miller or bought her vote. Helton testified that he did not know Ruth Miller and that her testimony was wholly untrue. A number of witnesses say that he went to the Four Mile voting place between 1:30 o'clock and 2 o'clock that afternoon, stayed about ten minutes but did not have any opportunity and did not talk to Ruth Miller. Some witnesses say she had

been distributing election cards for other candidates and left before noon. The woman's general reputation for morals was proven to be bad, and no attempt was made to refute the impeachment. An election officer testified that she had voted across the table for Helton's opponent, the contestant, Osborne.

Realizing the weakness of his case, the appellant challenges here, as he did in the trial court, the competency and character of the evidence impeaching the witnesses George Crockett and Ruth Miller. Upon cross examination some of the witnesses testifying to their bad general reputations were able to recall only the names of a few persons who they had heard discuss their reputations. Some of the witnesses stated the whole community talked about the Miller woman. We quite agree that the proof must relate to a general reputation and not to what a few individuals may think of the witness. 2 Wigmore on Evidence, Section 1612; 10 R. C. L. 952. Giving due consideration to the testing of the knowledge of the witnesses, we are persuaded they knew whereof they spoke, namely, that the reputations of both Crockett and Ruth Miller generally in the community were bad. The competency and sufficiency of the evidence is further questioned because of the bases of the reputations as disclosed on cross examination. Those bases or bad characteristics need not be related here. They were sufficient to establish a general bad character as distinguished from bad reputation which follows. Appellant insists that not having been confined to the trait of false swearing, the impeachment should be disregarded, for an individual may be guilty of unchastity or adultery or bootlegging or other sins and yet tell the truth. One hundred and twenty years ago in Hume v. Scott, 3 A. K. Marsh. 260, 10 Ky. 260, the court considered this point where the circuit court had excluded testimony as to a witness' general moral character. The exclusion was held erroneous for these reasons:

"Every person conversant with human nature must be sensible of the kindred nature of the vices to which it is addicted. So true is this, that to ascertain the existence of one vice, of a particular character, is, frequently, to prove the existence of more at the same time in the same individual. Add to this, that persons of infamous character may, and

do, frequently exist who have formed no character as to their lack of truth, and society may have never had the opportunity of ascertaining that they are false in their words or oaths. At the same time, they may be notoriously guilty of acting falsehood, in frauds, forgeries, and other crimes, as would leave no doubt of their being capable of speaking and swearing it, especially as they may frequently depose falsehood with greater security against detection than practice those other vices. In such cases, and with such characters, ought the jury to be precluded from drawing inferences unfavorable to their truth as witnesses, by excluding their general turpitude? By the character of every individual, that is, by the estimation in which he is held in the society or neighborhood where he is conversant, his word and his oath is estimated. If that is free from imputation, his testimony weighs well. If it is sullied, in the same proportion his word will be doubted. We conceive it perfectly safe, and most conducive to the purposes of justice, to trust the jury with a full knowledge of the standing of a witness into whose character an inquiry is made. It will not thence follow that, from minor vices, they will draw the conclusion, in every instance, that his oath must be discredited, but only be put on their guard to scrutinize his statements more strictly; while in cases of vile reputation, in other respects, they would be warranted in disbelieving him, though he had never been called so often to the book as to fix upon him the reputation of a liar, when on oath.''

Since that opinion the Civil Code of Practice has been adopted. Section 597 provides that a witness may be impeached by evidence that his general reputation for untruthfulness or immorality renders him unworthy of belief. This has been consistently construed to permit proof of general reputation of immorality, regardless of the particular trait, the unworthiness of belief being for the jury to determine.

In the case at bar, if Crockett's testimony be accepted at face value, it is insufficient for he did not indicate there was any consideration either promised or given for the liquor. And if the impeachment of Ruth Miller be also disregarded, her testimony was destroyed by direct contradictions and the circumstances. But to

fortify the weak evidence tending to show the contestee violated the Corrupt Practice Act, Kentucky Statutes, Section 1565b-1 et seq., we are referred to some of our opinions in other cases in which are related the political activities of the appellee and others mentioned as having bought votes and otherwise corrupted elections. It is to be said that, of course, we try this case on this record. It is unfortunately true that the germ of evil political practices is often chronic in its effect; but in the present limited disclosures if past performances are to be regarded at all they are persuasive that the contestee would have been too smart and too cautious to have had liquor so freely and publicly dispensed from his own home as Crockett's testimony would indicate, or to have openly bought the vote of the woman as she testified.

We are of the opinion that the trial court properly ruled the contestant did not prove the contestee guilty of violating the Corrupt Practice Act.

Judgment affirmed.